1

2

3

4

5

6

7                          IN THE UNITED STATES DISTRICT COURT

8                        FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   DAVID A. BRADLOW,                          No. C06-05344 MJJ

11              Plaintiff-Appellant,          **ORDER AFFIRMING JUDGMENT OF
                                              BANKRUPTCY COURT**

12      v.

13   THE CASTANO GROUP, ET AL.,

14              Defendant-Appellees.
                                        /

15   _____

16                                  **INTRODUCTION**

17          Before the Court is an appeal brought by Plaintiff-Appellant David A. Bradlow as Plan

18   Disbursing Agent for the bankruptcy estate of Melvin Mouron Belli ("the Estate") from a series of

19   partial summary judgment rulings made by the Bankruptcy Court in an adversary proceeding by the

20   Estate against Defendants-Appellees "The Castano Group" and approximately 60 lawyers or law

21   firms that the Estate alleged were members of that group.  In the adversary proceeding, the Estate

22   alleged that these defendants received a portion of the $1.25 billion in attorneys fees awarded  in the

23   California state class action, *Ellis v. R.J. Reynolds Tobacco Co.* ("*Ellis*").  The Estate further alleged

24   that Melvin Mouron Belli ("Belli") was a founding member of the group and was entitled to a share

25   of the $1.25 billion attorneys' fee award.  The Bankruptcy Court, in a series of partial summary

26   judgment orders, ruled that the Estate could not recover any share of the fee award in the *Ellis*

27   action.  The parties then stipulated that the value of the only remaining claim, for Belli's partnership

28   interest in the group as of the time of his death, was $50,000.  E.R. 2078-80.  The Bankruptcy Court

*United States District Court*
For the Northern District of California

1   entered a final judgment against Defendants-Appellees in that amount on August 8, 2006.  E.R.

2   2078-80.  The Estate now appeals the Bankruptcy Court's rulings that the Estate could not recover

3   any share of the fee award in the *Ellis* action.

**FACTUAL BACKGROUND**

5          The following facts are not in dispute for purposes of this appeal.

6          Belli was a prominent plaintiff's attorney who practiced primarily in California under the

7   name of the Law Offices of Melvin M. Belli ("LOMB"), a sole proprietorship.  He spent a

8   significant part of his career dating back to the 1950s pursuing litigation against tobacco companies.

9   In 1985, Belli filed *Galbraith et. al. v. R.J. Reynolds Tobacco Co.*, arguing to the jury a theory of

10  "addiction liability."  E.R. 47, 1843.[1]  Belli lost the case, but convinced three of the 12-member jury

11  to vote for the plaintiff.  E.R. 1894.  Because of this case and others before it, Belli had built a

12  wealth of knowledge and a significant collection of resources on tobacco litigation.  E.R. 1845.  A

13  primary reason for his lack of success in these claims was that the tobacco companies could always

14  argue that a smoker had assumed a risk when using their products.  E.R. 1845.

15         In early 1994, new evidence emerged that tobacco companies had manipulated the nicotine

16  levels in their cigarettes in order to ensure their addictiveness.   Many thought that with this new

17  evidence a successful claim could be brought, because now the tobacco companies' assumption of

18  the risk argument could be defeated by tangible evidence.

19         In late 1993 or early 1994, several prominent plaintiff's attorneys pooled their resources and

20  formed an unincorporated consortium of lawyers and/or law firms, sometimes referred to as "The

21  Castano Group" ("Group").  The Group began work on a class action, including New Orleans

22  attorney Wendell H. Gauthier ("Gauthier").  E.R. 88.  On March 29, 1994, the Group filed a

23  nationwide class action, *Castano v. the American Tobacco Co.*, No. 94-CV-1044, in the United

24  States District Court for the Eastern District of Louisiana.  E.R. 89.  Fifty-six attorneys from 26

25  different law firms represented the *Castano* plaintiffs against seven different tobacco companies.

26  *See Castano v. The American Tobacco Co.*, 160 F.R.D. 544, 546-47 (E.D. La. 1995).  Belli was one

27  of the attorneys listed as representing the Plaintiffs.  *See Castano*, 160 F.R.D. at 547.

28

---

[1] "E.R." refers to the Joint Appendix of Excerpts of Record submitted by the parties.

On April 12, 1994, the Group held its first meeting in New Orleans, Louisiana. E.R. 49. Belli was in attendance. E.R. 49. At this meeting, the Group formed committees and discussed an overall strategy for the upcoming litigation. The Group asked the invited attorneys to pay an entry fee of $100,000 to finance costs associated with the litigation. E.R. 63. Belli paid $50,000 to the Group at this time. E.R. 64-65. Belli attended only one other meeting of the Group on June 20, 1994. E.R. 64. This meeting was also in New Orleans. E.R. 64-65.

Belli, as a member of the Group in 1994, was on the Group's public relations and finance committees. E.R. 1653. A part of the Group's strategy was to win media attention and to force negative publicity on the tobacco companies. E.R. 49, 1835. Belli, with his celebrity profile, served this goal by attracting the attention of the media in several instances. E.R. 49, 1890, 1892, 1901. This attention also helped to notify potential class members, many of whom contacted Belli's California office. E.R. 1650, 1653-54, 1905-06.

On February 17, 1995, United States District Judge Benjamin Jones of the Eastern District of Louisiana certified the class in the *Castano* class action. *See Castano v. The American Tobacco Co.*, 160 F.R.D. 544 (E.D. La. 1995). The potential class included: (a) all nicotine-dependent persons in the United States, its territories, possessions and the Commonwealth of Puerto Rico, who purchased and smoked cigarettes manufactured by the defendants; (b) the estates, representatives, and administrators of these nicotine-dependent cigarette smokers; and (c) the spouses, children, relatives and "significant others" of these nicotine-dependent cigarette smokers as their heirs or survivors. *Id.* at 560-61. The tobacco companies appealed the class certification, but on March 13, 1996, while the appeal was pending, attorneys from one of the companies, the Liggett Group ("Liggett"), entered into settlement discussions with attorneys for the Group, agreeing to pay damages and to provide the Group with additional documents to use in its continuing litigation. E.R. 1749, 1907, 1908.

On May 23, 1996, the United States Court of Appeals for the Fifth Circuit reversed the class certification on the grounds that the federal district court had failed to consider how variations in state law would affect predominance and superiority. *See Castano v. The American Tobacco Co.*, 84 F.3d 734, 752 (5th Cir. 1996). The court also denied Liggett's conditional motion to dismiss. *See Castano*, 84 F.3d at 737 n.3. On remand, the case proceeded as a complaint by named plaintiffs in

1   their individual capacity.

2       It was around this time that Belli began to have problems in his personal life.  On December

3   7, 1995, Belli filed for Chapter 11 bankruptcy.  E.R. 459.  One month later in January of 1996, he

4   was diagnosed with a terminal illness.  E.R. 90.  By the time of the settlement discussions with

5   Liggett in March 1996 and the strategy meetings the Group held in June 1996, Belli was bedridden

6   and unable to attend.  On July 9, 1996, Belli died.  E.R. 90, 459.

7       In August 1995, James Ellis had approached the Group about filing a suit against tobacco

8   companies.  E.R. 1692.  Unnamed members of the Group informed Ellis at this time that he could be

9   part of the National Class Action and, if that class ultimately was decertified, then the Group would

10  bring an action against the tobacco companies on his behalf in California courts.  E.R. 1692.  On

11  July 26, 1996, 17 days after Belli's death, the Group filed the *Ellis* action in Superior Court in

12  Orange County, California.  Like the *Castano* litigation, it also was a coordinated attack filed on

13  behalf of smokers against tobacco companies.

14      Around the same time, in late July 1996, the Group began drafting a written agreement to

15  govern its members.  The agreement, signed in October 1996, was titled "Castano Plaintiffs

16  Attorneys Agreement" ("1996 Agreement").  Although drafted and signed in 1996, the Agreement in

17  its first line indicated that it was "entered into effective as of January 1, 1994."  E.R. 99.  The 1996

18  Agreement was 26 pages long, typed and double spaced with a two page annex and three exhibits

19  totaling six pages.  E.R. 99-132.  The only non-witness signatures on the Agreement belonged to

20  Gauthier and Robert L. Redfearn ("Redfearn").  E.R. 124.

21      The first exhibit to the Agreement was titled "Exhibit A - Membership" and was dated

22  October 23, 1996.  E.R. 127-29.  It listed the attorneys' names in alphabetical order, their law firms

23  (if applicable), their cities, and the initial financial assessment in connection with the *Castano*

24  action.  E.R. 127-29.  Only one attorney was listed for each law firm.  E.R. 127-29.  Sixty-two total

25  members were listed.  E.R. 127-29.  The fifth name down the list was Melvin Caesar Belli ("Caesar

26  Belli") who is Belli's son.  E.R. 127.  The corresponding law firm on the list was the "Law Offices

27  of Melvin M. Belli" from San Francisco, and the initial assessment was listed as $100,000.  E.R.

28  127.  There is no evidence to suggest that, before or after the Agreement was drafted, Caesar Belli

United States District Court
For the Northern District of California

4

United States District Court

For the Northern District of California

1   performed any work on tobacco litigation in connection with the Group.

2   Shortly before the Agreement was signed, a United States Bankruptcy Court approved the

3   sale of the Belli law practice to the firm of Lieff, Cabraser, Heimann, and Bernstein ("Lieff

4   Cabraser") on August 15, 1996. E.R. 554. Members of this firm had been active in the *Castano*

5   litigation since its inception in 1994. Partners Robert Lieff and Elizabeth Cabraser drafted the

6   original complaint in the *Castano* action, and partner Richard Heimann was the head of the Group's

7   Discovery Committee. Lieff Cabraser withdrew from the Group in 1997, but remained as counsel

8   for some plaintiffs in parallel litigation against tobacco companies.

9   On January 15, 1997, the *Ellis* action was dismissed by the Orange County Superior Court

10  and plaintiffs re-filed in San Diego County Superior Court. E.R. 92. California Lieutenant

11  Governor Gray Davis joined the suit as a plaintiff on behalf of the State of California. E.R. 93. In

12  April 1997, tobacco industry representatives began settlement negotiations with members of the

13  Group for the *Ellis* action as well as other lawsuits around the country. On November 23, 1998,

14  *Ellis* and other state actions around the country settled in a historic Master Settlement Agreement

15  ("MSA"), which required the tobacco companies to pay $240 billion as part of the settlement, $25

16  billion of which was earmarked as the share for the *Ellis* action. E.R. 93-94, 133-238. On

17  December 9, 1998, the tobacco companies signed a fee arbitration agreement to govern the attorneys

18  fees that should be awarded for the *Ellis* action. E.R. 94-95, 240. On September 28, 2000, the

19  tobacco companies entered into a fee payment agreement with counsel from the *Ellis* case. E.R. 95,

20  246-71. The agreement included a provision for arbitration to determine the proper fee awards.

21  E.R. 246-71.

22  On July 24, 2000, Richard Adler, an attorney representing the Estate, wrote a letter to

23  Gauthier requesting that the Estate's attorneys be included in any negotiations regarding fees earned

24  by Belli from the *Castano* litigation. E.R. 462, 467-68. On October 3, 2000, having received no

25  response to his first letter, Adler sent a second letter to Gauthier. E.R. 462, 469. This second letter

26  stated that the silence of the Group was presumed to be an acquiescence to the request made in the

27  first letter. E.R. 469. On November 28, 2000, Gauthier responded, indicating that his silence should

28  not be taken as an acquiescence of the assertions of the July 24th letter and noting that Belli had only

paid half of the originally assessed $100,000.  E.R. 462, 470.  Gauthier also noted that Belli had

submitted claims of close to $20,000 for prior work and requested that Adler send any other records

of other expenses that Belli incurred from his work with the Group.  E.R. 470.

From February 26 through March 1, 2001, a panel of three arbitrators in New York reviewed

evidence and heard testimony regarding the Group's work in the tobacco cases.  E.R. 96.  No

representatives for the Estate participated.  The Group then organized a Fee Committee to review the

submissions of the Group's members to determine how much each member was entitled.  E.R. 96.

The Fee Committee interviewed Group members in mid-March 2001.  E.R. 96.  On May 11, 2001,

the Fee Committee's final payment plan was approved by the individual members of the Group.  On

June 11, 2001, a majority of the New York arbitration panel awarded $1.25 billion in attorneys fees

to the Group.  E.R. 96, 272-338.

On June 19, 2001, after the award was announced, Lieff, on behalf of the Estate, sent a letter

to Gauthier, asking to discuss Belli's contributions to the Group.  E.R. 477, 488.  Then on June 25,

Lieff sent a letter to Calvin Fayard, a member of the Group's Executive Committee, memorializing

their phone conversation of the week before.  E.R. 477, 489.   He mentioned that the Estate was in

no way waiving its claim to a share of the Group's fee award from the tobacco litigation.  E.R. 489.

On September 25, 2002, a New York State court overturned the *Ellis* Fee Award, holding

that it was improper for the arbitration panel to consider work done on other cases when calculating

the award.  *Brown & Williamson Tobacco Corp. v. Chesley*, 749 N.Y.S.2d 842 (2002).  ("*B&W I*").

On May 18, 2004, the appeals court reinstated the full amount of the award.  *Brown & Williamson*

*Tobacco Corp. v. Chesley*, 777 N.Y.S.2d 82 (2004) ("*B&W II*").  The court held that it was proper to

consider work done prior to the filing of the complaint in *Ellis* given the Group's "unique

professional experience and expertise."  *Id*. at 88.

Litigation in the United States Bankruptcy Court for the Northern District of California

began on July 14, 2004, when the Estate filed a complaint against Defendants-Appellees.  The

complaint raised claims of breach of contract, breach of fiduciary duty, quantum meruit, and unjust

enrichment.  The Estate asked for compensatory and punitive damages and requested a declaration

that the Estate was entitled to a percentage of the $1.25 billion *Ellis* fee award.

6

United States District Court
For the Northern District of California

1    Defendants-Appellees moved for summary judgment on June 10, 2005, and the Bankruptcy

2    Court granted partial summary judgment on August 1, 2005. E.R. 580-84. In its Order, the

3    Bankruptcy Court found that Belli was not an attorney participating in the *Ellis* action and had no

4    direct right to receive a share of the fee award. E.R. 581. The Bankruptcy Court found that the

5    Estate also had no indirect right to receive a share of the Ellis fee award, except as provided in the

6    1996 Agreement. E.R. 581. The Bankruptcy Court found that the Estate had "submitted no

7    evidence of any other agreement, or of any other facts, that give rise to any right to a share of the

8    Fee Award, and Plaintiff has not stated a basis under Fed.R.Civ.P. 56(f) to be granted additional

9    time to obtain such evidence." E.R. 581. The Bankruptcy Court further found that the Estate failed

10   to report to the Group any legal services performed or costs incurred by Belli or his firm pursuant to

11   the 1996 Agreement, and found that the Estate's right to any share of the fee award would be limited

12   to the amounts payable under paragraph 11 of the 1996 Agreement. E.R. 581-82. The Bankruptcy

13   Court, however, denied summary judgment to Defendants-Appellees as to several additional issues:

14   (1) whether LOMB was a party to the 1996 Agreement; (2) whether LOMB withdrew its

15   membership in the Group; (3) whether the Estate was entitled to any share of the *Ellis* fee award

16   under the 1996 Agreement; and (4) whether the Estate's recovery under the 1996 Agreement was

17   "limited by partnership law or the fact that Melvin M. Belli died on July 9, 1996." E.R. 582-83.

18   After additional discovery, the Group moved for further summary judgment on December 5,

19   2005 and the Bankruptcy Court granted additional partial summary judgment on February 18, 2006.

20   E.R. 2046-47. The Bankruptcy Court found that Belli was not a member of the partnership formed

21   via the 1996 Agreement, and that his estate had no right to any distribution of fees or expenses from

22   that partnership or under that agreement. E.R. 2047. The Bankruptcy Court further found that Belli

23   was a member of "an earlier Castano Group" formed in 1994, but ceased to be a member of that

24   group upon his death in 1996. E.R. 2047. The court also found that the only remaining basis for

25   recovery from the partnership formed via the 1996 Agreement or its partners was "upon the theory

26   that many of those partners were also members of the [earlier] Group, and were obligated to return

27   Belli's capital contribution, and/or an appropriate share of the Group's other assets, to Belli's estate

28   upon his death." E.R. 2047. The Bankruptcy Court ruled that "the value of the Group's assets and

7

Belli's interest in the Group must be determined as of the time of Belli's death." E.R. 2047. The Bankruptcy Court's February 18, 2006 partial summary judgment order left open the question of whether the Estate was entitled to recover under such a theory and, if so, the amount of such recovery. E.R. 2047.

On August 9, 2006, the Bankruptcy Court issued its final judgment. E.R. 2078-80. The Bankruptcy Court's judgment indicated that it had determined that the sole remaining theory for recovery, even if successful, could not support a claim to an interest in the *Ellis* fee award. E.R. 2079. The judgment further indicated that the parties, while reserving the right to appeal, had stipulated that "in the event the final disposition of Plaintiff's appeal of this Judgment is an affirmance or a dismissal, Plaintiff shall be entitled to recover from Defendants the sum of $50,000.00 (fifty thousand dollars) as the value of the Remaining Claim, satisfaction of which shall terminate this adversary proceeding in its entirety, with prejudice." E.R. 2079-80.

On August 17, 2006, the Estate filed a Notice of Appeal. E.R. 2082-85. The Estate elected to have it appeal heard by this Court pursuant to 28 U.S.C. § 158(c)(1). E.R. 2086-87.

## LEGAL STANDARD

When considering an appeal from the Bankruptcy Court, a district court uses the same standard of review that a circuit court would use in reviewing a decision of a district court. *In re Baroff*, 105 F.3d 439, 441 (9th Cir.1997). The Court reviews *de novo* the Bankruptcy Court's grant of summary judgment. *In re Raintree Healthcare Corp.*, 431 F.3d 685, 687 (9th Cir. 2005)**.** Viewing the evidence in the light most favorable to the nonmoving party, the Court must determine whether any genuine issues of material fact exist and whether the Bankruptcy Court correctly applied the substantive law. *In re Wallace*, 259 B.R. 170, 178 (C.D. Cal. 2000). The Bankruptcy Court may be affirmed on any ground supported by the record. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of demonstrating the basis for the motion and identifying the portions of the pleadings,

United States District Court

For the Northern District of California

8

1   depositions, answers to interrogatories, affidavits, and admissions on file that establish the absence

2   of a triable issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving

3   party meets this initial burden, the burden then shifts to the non-moving party to present specific

4   facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324;

5   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  The non-movant's

6   bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion

7   for summary judgment.  *Id.* at 247-48.  An issue of fact is material if, under the substantive law of

8   the case, resolution of the factual dispute might affect the case's outcome.  *Anderson*, 477 U.S. at

9   248.  Factual disputes are genuine if they "properly can be resolved in favor of either party."  *Id.* at

10  250.  Thus, a genuine issue for trial exists if the non-movant presents evidence from which a

11  reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the

12  material issue in his or her favor.  *Id.*  "If the evidence is merely colorable, or is not significantly

13  probative, summary judgment may be granted."  *Id.* at 249-50 (internal citations omitted).

## ANALYSIS

15          On appeal, the Estate argues that the Bankruptcy Court erred because there was evidence

16  from which a reasonable trier of fact could find that Belli was entitled to a share in the *Ellis* fee

17  award.  The Estate's theory of recovery, for purposes of this appeal, is premised not on a contractual

18  obligation first created by the written 1996 Agreement, but on an earlier 1994 implied or oral

19  agreement to share fees among members of the Group, which the Estate contends was later

20  memorialized by the written 1996 Agreement.  Specifically, the Estate argues that Belli "was a

21  member of the Castano Group partnership from its formation in 1994" (Br. at 15:22-23), and that

22  "the material terms of the original implied agreement for the sharing of partnership revenues were

23  memorialized in a writing of October of 1996" (Br. at 15:28-16:1.)  The Estate further argues that

24  "the written October 1996 Agreement provided, as did the original implied agreement, for the

25  sharing of fee recoveries in actions prosecuted by the Group, whether or not the member in question

26  worked on the action that generated the fee."  (Br. at 16:3-5.)  Under the terms of the implied

27  agreement, then, the Estate asserts that Belli is "entitled to a share in the Fee Award on the same

28  basis as other members of the Castano Group."  (Br. at 16:9-10.)

1    For the reasons discussed below, the Court finds that the Estate's theory of recovery cannot

2    prevail as a matter of law, and that the judgment of the Bankruptcy Court must be affirmed.

3    **I.      Louisiana Law Controls The Outcome Of The Case**.

4    As a threshold matter, the parties dispute which state's laws govern the contract and

5    partnership law issues involved in this dispute.  Defendants-Appellees asserts that Louisiana law

6    should be applied, while the Estate argues that California law governs.[2]

7    In a bankruptcy case, the court must apply federal choice of law rules.  *See In re Vortex*

8    *Fishing Systems, Inc.*, 277 F.3d 1057, 1069 (9th Cir. 2002).  Federal choice of law rules follow the

9    approach of the Restatement (Second) of Conflict of Laws (hereafter "Restatement").  *See id.;*

10   *Chuidian v. Philippine Nat'l Bank*, 976 F.2d 561, 564 (9th Cir. 1992).

11   Here, the Estate's theory of recovery is premised on the contention that an agreement created

12   a partnership among lawyers and/or law firms desiring to pursue litigation against tobacco

13   companies, and that one of the material terms of that agreement provided for the sharing of fee

14   recoveries in actions prosecuted by the partnership, whether or not the member in question worked

15   on the action that generated the fee.  (Br. at 15-16.)   Section 294 of the Restatement therefore

16   governs this Court's determination of which local law applies.  *See* Restatement, Section 294, cmt. a

17   ("This Section deals with the question of what law determines the obligations of the partners as

18   between themselves.")  Section 294 provides:

19          The rights and duties owed by partners to each other are determined by
            the local law of the state which, with respect to the particular issue,
20          has the most significant relationship to the partners and the transaction
            under the principles stated in § 6.  This law is selected by application
21          of the rules of §§ 187-188.

22   Under the Restatement, this Court must therefore determine which state has the "most

23   significant relationship" to the partners and the transaction under the principles articulated in Section

24

25          [2] Defendants-Appellees argue that the Estate's failure to contend that California law applies in its opening brief
     should preclude it from contesting on appeal that Louisiana law applies.  To the extent the Estate failed in its opening brief
26   to challenge an express ground relied upon by the Bankruptcy Court to grant partial summary judgment, such failure would
     constitute waiver of the issue on appeal.  Here, however, there is some ambiguity as to whether Louisiana law provided the
27   basis for the Bankruptcy Court's determinations that Belli ceased to be a member of the Group upon his death and that the
     value of the Group's assets and Belli's interest in the Group must be determined as of the time of Belli's death.  Although
     Defendants-Appellees argued on behalf of those very conclusions using Louisiana law, (E.R. 73-76, 84-85, 495-501, 708,
28   2007), the Bankruptcy Court did not expressly indicate whether its ruling was predicated on Louisiana law.  (E.R. 2078-80.)
     Accordingly, the Court finds no waiver by the Estate of this issue and will consider the choice of law question on the merits.

United States District Court
For the Northern District of California

6 of the restatement.  Section 6(2) indicates that the relevant principles to take into account are:

> (a)    the needs of the interstate and international systems,
> (b)    the relevant policies of the forum,
> (c)    the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d)    the protection of justified expectations,
> (e)    the basic policies underlying the particular field of law,
> (f)    certainty, predictability and uniformity of result, and
> (g)    ease in the determination and application of the law to be applied.

Finally, Section 188 of the Restatement indicates that the following contacts with a state should be taken into account when applying the principles articulated Section 6:

> (a)    the place of contracting,
> (b)    the place of negotiation of the contract,
> (c)    the place of performance,
> (d)    the location of the subject matter of the contract, and
> (e)    domicile, residence, nationality, place of incorporation and place of business of the parties.

Applying Section 6 and Section 188 of the Restatement here, it is clear to the Court that Louisiana law controls this dispute.  The partnership that the Estate alleges was formed by the 1994 implied-in-fact agreement held its formative meetings in Louisiana.  E.R. 89.  The principal place of business for the Group is, and always has been in Louisiana.  E.R. 89.  The membership of the Group consisted of a plurality of over twenty Louisiana domiciled lawyers or law firms. The original class action filed by the group, *Castano v. the American Tobacco Co.*, was filed in a federal court in Louisiana.  E.R. 89.  All assessments paid to the group, including Belli's own $50,000 contribution, were made in Louisiana.  E.R. 89.  All support staff employed by the Group are employed under Louisiana law.  E.R. 89.  The Group withholds Louisiana state income tax on its support staff salaries and their tax returns show a domicile in the State of Louisiana.  E.R. 89.  The Group's bank accounts are maintained in Louisiana.  E.R. 89.   Thus, all five factors identified in Section 188 of the restatement heavily favor Louisiana, and these factors strongly indicate that Louisiana has the "most significant relationship to the partners and the transaction."  Restatement § 294; *cf. Daynard v. MRRM, P.A.*, 335 F. Supp. 2d 156, 162-63 (D. Mass. 2004) (finding Louisiana law controlled contract claim for attorneys fees against the Group by Massachusetts law professor that assisted

1    tobacco litigation).[3]

2          The Estate's contention that California law should apply instead is unpersuasive.  In focusing

3    on the fact that Belli resided in and practiced in California, and performed most of his work on

4    behalf of the Group in California, the Estate ignores that the alleged agreement upon which they

5    base their claim was not merely an individual contract for services with a single lawyer, but a

6    contract creating a broader partnership among multiple lawyers and/or law firms.  The Estate's

7    contention, carried to its logical end, would require a court to apply a different local law to a single

8    agreement establishing the partnership each time a different partner had a dispute with the

9    partnership.  The Estate points to no evidence that such a result was desired by the Castano Group

10   partners.  Selecting local law in the manner suggested by the Estate is inconsistent with the

11   Restatement's guidance that local law be selected in a manner that promotes "certainty,

12   predictability and uniformity of result" and "ease in the determination and application of the law to

13   be applied."  Restatement §§ 6(2)(f) & (g).

14         The Estate also argues that California law should apply because the *Ellis* action was filed and

15   litigated in California.  However, the location of the *Ellis* action is of little weight in determining

16   which local law should apply to either the alleged 1994 implied/oral agreement or the written 1996

17   Agreement.  Though the settlement of the *Ellis* action was ultimately the source of the fee award that

18   is the subject of this dispute, the *Ellis* action was but one of many lawsuits initiated and prosecuted

19   by members of the Group.  There is no evidence suggesting that the original members of the Group

20   expected in 1994, at the time of the formation of the alleged agreement relied upon by the Estate,

21   that the majority of the tobacco litigation that the partnership pursued would occur in California.  To

22   the contrary, the Group initially pursued a nationwide class action filed in Louisiana federal court,

23   and only turned to individual state court actions after the national class was decertified.  Nor is there

24

25          [3] The Estate argues that Section 196 of the Restatement should apply to the alleged 1994 agreement creating the
26   partnership because it involved a "contract for services."  The Court disagrees.  As the comments to Section 196 of the
     Restatement make clear, Section 196 applies "if the major portion of the services called for by the contract is to be rendered
     in a single state and it is possible to identify this state at the time the contract is made."  Restatement, Section 196, cmt a.
27   Section 196 is not applicable here, where the 1994 agreement is alleged by the Estate itself to have created a partnership
     among numerous lawyers and law firms in several different states.  Moreover, to the extent the parties to the initial 1994
28   agreement anticipated that a major portion of the services would be rendered in a single state, that state would clearly be
     Louisiana, where the initial *Castano* litigation was litigated in federal court.

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

1  any evidence suggesting that the parties to the 1996 Agreement intended the *Ellis* action to be the

2  primary focus of the Group's ongoing efforts; to the contrary, the written Agreement lists the *Ellis*

3  action as but one of 13 then-pending state class actions. and as the only state class action then

4  pending in California.  (E.R. 130.)

5         Accordingly, the Court finds that the local law of Louisiana law governs this dispute.

6  **II.     The Estate Cannot Recover On The Basis Of Obligations First Created By The Written**

7  **1996 Agreement.**

8         Undisputed facts in the record make clear that the Estate cannot recover on the basis of any

9  obligation first created by the written 1996 Agreement, because neither Belli, Belli's sole

10  proprietorship, nor the Estate itself were parties to the 1996 Agreement.

11         The Bankruptcy Court correctly determined that Belli was not a party to the 1996

12  Agreement.  E.R. 2047.  The 1996 Agreement was not executed until October 1996, three months

13  after Belli died.  Belli therefore had no capacity to enter into the 1996 Agreement.  *See Landers v.*

14  *Integrated Health Servs. of Shreveport*, 903 So. 2d 609, 612 (La. Ct. App. 2005) (capacity required

15  for formation of an enforceable contract).  Moreover, the Estate concedes that Belli was never given

16  notice of the making of the October 1996 Agreement.  (Br. at 23:22.)

17         Because Belli was already deceased at the time that the 1996 Agreement was executed,

18  Belli's sole proprietorship also had no capacity to enter into the 1996 Agreement.  The Estate

19  concedes that LOMB was a sole proprietorship.  (Br. at 18 n.7; Reply at 6:14-15, *see also* E.R. 460.)

20  Under Louisiana law, Belli's sole proprietorship had no capacity to contract or act independently of

21  himself.  "A sole proprietorship is not a legal entity.  It is merely a designation assigned to a manner

22  of doing business by an individual.  While the individual involved in the sole proprietorship may

23  consider the business to be separate and distinct from his/her person, there exists no legal distinction

24  between the individual and the business."  *Robinson v. Heard*, 809 So. 2d 943, 945-46 (La. 2002)

25  (citation omitted).  Under Louisiana law, LOMB had no capacity to enter into a contract even while

26  Belli was still alive; only Belli individually had the capacity to enter into a contract.  *See id.* at 946.

27  The Court therefore rejects the Estate's apparent assertion in its reply brief (Reply at 1:6, 1:17) that

28  LOMB was a party to the 1996 Agreement.

**United States District Court**
For the Northern District of California

1    Nothing in the record suggests that the Estate itself was a party to the 1996 Agreement.  The

2  Estate makes no argument and submits no evidence that it was a party to the 1996 Agreement;

3  indeed, the Estate concedes that representatives of the bankruptcy estate were unaware of the

4  formation of the 1996 Agreement until after they commenced the adversary proceeding in 2004.

5  (Br. 23:22-23 & 26. n.11; E.R. 461.)

6    Accordingly, the Court concludes that the Estate cannot recover on the basis of any

7  obligation first created by the written 1996 Agreement.

8  **III.   The Estate Cannot Recover A Share Of The *Ellis* Fee Award Under Any Earlier,**

9       **Implied Or Oral Agreement Established By Evidence In The Record.**

10    Unable to rely directly on obligations created by the 1996 Agreement, the Estate points to the

11  1996 Agreement as a "memorialization" of fee-sharing terms that were allegedly part of an earlier

12  implied and/or oral agreement that first formed the Group partnership in 1994.  (Br. at 15:22-16:2,

13  17:25-26; Reply at 11:5-7.)  Defendants correctly assert that the 1996 Agreement has several

14  features suggesting that it may have been, at least in part, a memorialization of an earlier agreement

15  among the Group's partners, including that it referenced an effective date of January 1, 1994 (E.R.

16  99), that it discussed the Group's intent to "continue the prosecution" of litigation against tobacco

17  companies (E.R. 100), that it acknowledged the value and importance of past work by Group

18  members (E.R. 104), and that it did not contain an integration clause barring evidence of a prior oral

19  or implied agreement.

20    Nonetheless, even assuming the existence of an oral or implied agreement that formed the

21  Group partnership in 1994, Belli has failed to adduce evidence that such an agreement included

22  terms that would enable him to share in the *Ellis* fee award.

23    **A.   Belli Ceased To Be A Member Of The Group's Partnership Upon His Death In**

24       **July 1996.**

25  Even assuming that Belli was a member of the partnership of attorneys and/or law firms

26

27

28

1  formed by an implied or oral agreement in 1994,[4] the Bankruptcy Court correctly determined that

2  Belli ceased to be a member of that partnership upon his death in July 1996.

3        The Estate concedes that the 1994 association of lawyers and/or law firms formed by the

4  alleged 1994 implied or oral agreement was a partnership.  (Br. at 15:22-16:1.)  Under Louisiana

5  law, "[a] partner ceases to be a member of a partnership upon: his death or interdiction."  La. Civ.

6  Code art. 2818.  If Article 2818 applies to the Group partnership, then Belli ceased to be a member

7  of the partnership no later than July 1996.

8        The Estate argues that Louisiana Civil Code Article 2818 should not apply to Belli's

9  membership in the Group partnership because, according to the Estate, Louisiana caselaw creates an

10  exception to the general rules concerning partnerships when the division of attorneys fees is at issue.

11  The Estate cites a single case, *Robinson v. Thornton*, 705 So.2d 745 (La. Ct. App. 3rd Cir. 1998), for

12  this proposition.

13        In *Robinson*, the court considered an appeal from attorney Robinson asserting that he should

14  receive a larger proportion of the total contingency fee that had been paid to attorney Thornton under

15  Thornton's original retainer agreement with the client.  *See id.* at 746.  Subsequent to being retained

16  by the client, Thornton had associated Robinson to assist in the prosecution of the claim, under an

17  agreement which stated that "Dr. Robinson's fee will be 50% of Attorney Dr. Thornton's fee in this

18  case. . . ."  *Id.*  However, later in the underlying lawsuit, Thornton had, over Robinson's objection,

19  also retained an appellate specialist attorney to assist in the case under an agreement that promised

20  the appellate specialist would "receive 50% of the 40% attorney's fees expected to be derived from

21  this case."  *Id.* at 747.  When the case settled, Robinson disputed how the contingency fee in the case

22  should be divided among the three attorneys involved in the case.  The trial court ultimately awarded

23  50% of the contingency fee to the appellate specialist, 25% to Thornton, and 25% to Robinson, at

24  which point Robinson appealed.  *See id.* at 748.

25        The sole discussion of partnerships in *Robinson* was in connection with Robinson's argument

26  on appeal aimed at obtaining a portion of the fee that the trial court had awarded to the appellate

27

28        [4] As noted above, Belli's sole proprietorship, LOMB, had no ability to contract as a judicial person on its own; only Belli individually could have contracted in 1994 to become a member of the Group partnership.  *See Robinson*, 809 So. 2d at 945-46.

15

specialist.  Robinson asserted on appeal that he and Thornton had entered into a joint venture which, under general rules governing joint ventures and partnerships in Louisiana,[5] precluded Thornton from subsequently making the appellate specialist a member of the joint venture without Robinson's consent.  *See id.* at 748.  Rejecting Robinson's attempt to rely on joint venture rules to decide the allocation of the contingency fee, the court invoked its power Louisiana Rule of Professional Conduct 1.5 to ensure that lawyers' fees are reasonable.  *See id.* at 748.  The court explained: "While we agree with Robinson's interpretation of the law concerning joint ventures generally, the matter before us involves the special area of division of attorney fees, which constitutes an exception to the general rules concerning joint ventures."  *Id.*   Analyzing the record, the court then agreed with the trial court that Thornton had not given Robinson any veto power over the tactical decisions concerning the litigation, including whether to further subdivide the contingency fee by bringing in an appellate specialist.  The court found this fact dispositive, explaining:

> Even assuming there was a joint venture, we do not find any evidence
> to support Robinson's assertion that Thornton granted him any
> authority to prosecute the claim other than to assist in obtaining a
> satisfactory result for the clients.  The [clients] were Thornton's clients
> and not Robinson's, and we find to merit in Robinson's first
> assignment of error.

*Id.*

The Estate now cites to *Robinson*, and in particular the language in *Robinson* indicating that the "special area of division of attorney fees . . . constitutes an exception to the general rules concerning joint ventures", to argue that Louisiana Civil Code article 2818 should not be applied to terminate Belli's membership in the Group partnership as of his death in July 1996.  The Court reads *Robinson* far more narrowly than does the Estate.  *Robinson* relied on a **factual** basis for rejecting Robinson's reliance on joint venture principles; namely, that even if a joint venture between Robinson and Thornton existed, the joint venture did not extend as far as joint representation of the client, and therefore afforded Robinson no veto power over sharing the eventual contingency fee with other attorneys.  705 So.2d at 748.  In those circumstances, faced with three separate contracts

---

[5] Under Louisiana law, joint ventures are generally governed by the same rules applicable to partnerships.  *See Robinson*, 705 So.2d at 748; *Shepherd v.* Jay, 508 So. 2d 650, 652 (La. Ct. App. 1987).

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

regarding the contingency fee, the *Robinson* court found it appropriate to vet the division of the attorney fees under the "reasonableness" standard established by Louisiana Rule of Professional Conduct 1.5, rather than by joint venture principles. *Robinson*'s observation that the "special area of division of attorney fees . . . constitutes an exception to the general rules concerning joint ventures" must be read in this context, and does not state, as the Estate contends, a broad holding that nullifies all joint venture and partnership principles whenever the division of a fee recovery is at issue.

That *Robinson* did not categorically remove agreements regarding the division of attorneys fees from the operation of Louisiana partnership and joint venture principles is readily evident from other Louisiana decisions, both prior to and after *Robinson*. It remains solidly entrenched in Louisiana precedent that, at least in circumstances where attorneys jointly undertake to represent the client, Louisiana courts will treat agreements regarding attorneys fees among lawyers of different firms as joint ventures. *See Dukes v. Matheny*, 878 So. 2d 517, 519-520 (La. Ct. App. 2004) (collecting Louisiana cases treating fee agreements as joint ventures). Indeed, "the Louisiana Supreme Court has recognized 'where an attorney retained in a case employs or procures the employment of another to assist him, as regards the division of the fee, the agreement constitutes a joint venture or special partnership." *Hanks v. Columbia Women's and Children's Hosp.*, 865 So. 2d 745, 749 n.1 (La. Ct. App. 2003) (quoting *McCann v. Todd*, 14 So. 2d 469, 472 (La. 1943)). In such circumstances, where the fee-sharing arrangement is itself a joint venture, Louisiana courts have found that "the rules of Professional Conduct do not prohibit the enforcement of such an agreement and would not require the apportioning of the fee on a quantum meruit basis." *Dukes*, 878 So. 2d at 520 (citing *Scuerto v. Siegrist*, 598 So. 2d 507 (1992)). However, Louisiana courts have sometimes declined to treat a contract regarding the division of attorneys fees as a joint venture, and instead have apportioned fees under the reasonableness standards of Louisiana Rule of Professional Conduct 1.5, where the contracting attorneys did not jointly represent the client. *Dukes*, 878 So. 2d at 520-21. In this Court's view, the narrow holding in *Robinson* falls squarely into this latter category of cases, as *Robinson* decided to apply the reasonableness standards of Louisiana Rule of Professional Conduct 1.5 to the contracts before it because there was no joint representation of the client. *See Robinson*, 705 So.2d at 748 ( "The [clients] were Thornton's clients

United States District Court

For the Northern District of California

1  and not Robinson's . . .").  As *Hanks* and *Dukes* indicate, however, *Robinson* did not more broadly

2  reject the applicability of joint venture principles where a joint venture among law firms explicitly

3  concerns the overall division of fees.

4          More fundamentally, this Court sees no reason to read *Robinson* as abrogating the general

5  rule under Louisiana Civil Code Article 2818 that a member of a partnership or joint venture ceases

6  to be a member upon death.  *Robinson* did not purport to address the effect that a partner's death has

7  upon that partner's continued membership.  Nor does this Court discern any principle discussed in

8  *Robinson* that would lead a Louisiana court to ignore the effect of Article 2818 where, as here, there

9  is no dispute that a partnership or joint venture that had arrived at a fee-splitting arrangement

10  existed. (Br. at 15-16.)

11          Accordingly, the Court finds that, even assuming that Belli was a member of the Group

12  partnership initially formed by an implied or oral agreement in 1994, Belli ceased to be a member of

13  that partnership upon his death in July 1996 by operation of Louisiana law.[6]

14  **B.**      **The Estate Has Not Come Forward With Evidence Establishing That Any**

15              **Implied Or Oral 1994 Agreement Included A Promise To Pay Former Partners**

16              **Portions Of Future Fee Awards.**

17          The fact that Belli ceased to be a member of the Group partnership in July 1996 is fatal to the

18  Estate's theory of recovery, because the Estate has failed to adduce evidence that the alleged implied

19  or oral agreement reached in 1994 included a promise to pay former partners portions of future fee

20  awards.

21          In its efforts to prove the fee-sharing terms that were included in the alleged implied or oral

22  agreement reached in 1994, the Estate cites to only a few pieces of evidence in the record.

23  While some of this evidence indicates that there was an agreement to split future fee awards among

24  _____

25          [6] The fact that Belli filed for bankruptcy protection prior to his death does not mean that the Estate itself, or any
26  representative thereof, was substituted for Belli as a member of the Group partnership, either at the time Belli filed for
     protection or at the time he died.  While Belli's filing of a bankruptcy petition created an estate empowered to assert Belli's
27  interests (*see* 11 U.S.C. § 541), including any interests that may have existed because of Belli's membership in the Group
     partnership, it did not substitute the Estate or any Estate representative as a member of the partnership.  *Cf. Peck & Vantine*
28  *v. Hebert*, 589 So. 2d 57, 60 (La. Ct. App. 1991) (where state statute provided that a partner ceases to be member of
     partnership once a partner is granted an order for relief under Chapter 7 of the Bankruptcy Code, "the bankrupt partner ceases
     to be a member, but the bankruptcy trustee does not become a member of the partnership").

*current* members of the partnership even if those current members did not work on the lawsuit generating the fee award, none of the evidence suggests that there was an agreement to split future fee awards with *former* members of the partnership.

The Estate's primary evidence of the terms of the alleged 1994 agreement is the written 1996 Agreement itself; the Estate alleges that this written agreement "memorialized" the terms to which Belli and the other partners had previously implicitly or orally agreed.  (Br. at 12, 15-16.)  However, the fee-sharing terms set forth in the 1996 Agreement are inconsistent with any alleged intention to split future fee awards with former members of the partnership.  Paragraph 11 of the 1996 Agreement, which contains the fee-sharing terms, contains provisions that dictate that fees shall be split in accordance with certain procedures only among "Attorney Members."  E.R. 116-121. As the Estate itself contends, the 1996 Agreement "clearly provides that its *members* will share in the recoveries from any Castano Group tobacco litigation – regardless of whether a particular member actively participated in the litigation producing a recovery.  (Br. at 18.)  Nothing in the 1996 Agreement, however, suggests that the Group partners had agreed to split future fee recoveries with former members that had withdrawn, died, or otherwise left the partnership.[7]

None of the other evidence relied upon by the Estate to prove the terms of the implied or oral 1994 agreement puts the Estate in any better position.   As an initial matter, Mr. Lieff's conclusory testimony that "[i]t was understood from the very beginning by all members of the Castano Group that the lawyers who participated in the Castano Group would get a share of any fees ultimately awarded to members of that group" (E.R. 476) lacks foundation and is inadmissible speculation as to the contents of the minds of others.   Indeed, the Estate concedes that Mr. Lieff "does not recall any particular express articulation of words that created their contract" (Reply at 12:2), and Mr. Lieff's declaration fails to set forth any observed conduct or manifestations of assent that would lay a

---

[7]  The fact that Exhibit A to the 1996 Agreement lists Belli's son, Melvin Caesar Belli ("Caesar Belli"), as a member of the Group  (E.R. 127) is not evidence from which a reasonable factfinder could conclude that the Group intended to share future fee awards with former partners.  Moreover, for the reasons stated above in Section III.A, the fact that Exhibit A lists Caesar Belli's firm as "Law Offices of Melvin M. Belli" would not permit a reasonable factfinder to conclude that Belli or his sole proprietorship could have remained members of the partnership after Belli's death, given the automatic operation of  Louisiana Civil Code Article 2818.  The Estate does not assert any claim on behalf of Caesar Belli here.

United States District Court

For the the Northern District of California

United States District Court

For the Northern District of California

1   foundation for his conclusions.[8]  In any event, even if Mr. Lieff's testimony were admissible, it does

2   indicate that the partnership intended to share fees even with former partners after they had exited

3   the partnership.

4        Similarly, none of the other evidence cited by the Estate regarding the Group's initial broad

5   purpose or the parties' course of conduct during Belli's lifetime supports an inference that the

6   original parties to the implied or oral 1994 agreement intended to share fee awards even with former

7   partners of the partnership.  Nothing about the Group's early litigation efforts, nor Belli's

8   involvement with those efforts, suggests that such a provision was part of the implied or oral

9   agreement.  To the contrary, it is undisputed that several original members of the Group explicitly

10  chose to opt out of continued membership in the partnership before the 1996 Agreement was signed.

11  E.R. 91.  These former members of the partnership did not receive a share of the *Ellis* fee award.

12  E.R. 1973.

13       Finally, the Court rejects the Estate's contention that the pre-litigation communications

14  between the Estate and Defendants-Appellees establish that the terms of the original 1994 implied or

15  oral agreement included fee-sharing with former partners.  The Court cannot read such an admission

16  into Defendant-Appellee's responses.  Indeed, in a November 28, 2000 letter from Mr. Gauthier of

17  the Group to an Estate representative, Mr. Gauthier explicitly indicated that his "failure to reply

18  earlier should not be interpreted to mean that I agree with your statement that Mr. Belli's backruptcy

19  estate is entitled to any payment."  E.R. 470.

20       Because the Estate has not adduced evidence that any implied or oral 1994 agreement

21  included, as a material term, the promise to pay portions of future fee awards to former partners, and

22  because Belli ceased to be a partner in the Group partnership as of his death in 1996, the Bankruptcy

23  Court correctly concluded that undisputed facts established that the Estate had no contractual right to

24  any share of the *Ellis* fee award.

25  ///

26  ///

27

28  _____

    [8]  The Bankruptcy Court does not appear to have expressly ruled on Defendants-Appellees' objections that Mr.
    Lieff's testimony on this point lacked foundation and consisted of speculation  E.R. 574.  This Court finds that those
    objections should be sustained.

United States District Court

For the Northern District of California

**IV.    On Appeal, The Estate Does Not Seek A Portion Of The *Ellis* Fee Award Based On Belli's Partnership Interest At Time Of Death.**

The Estate's sole remaining claim after the Bankruptcy Court's two partial summary judgment orders was for the value of Belli's partnership interest as of the time of his death.[9]  On appeal, the Estate does not contend that it can recover a portion of the *Ellis* fee award based on this interest.  (Reply at 4:24-5:2.)  Instead, the parties have stipulated, as part of the Bankruptcy Court's final judgment, that this sole remaining claim is worth $50,000, the same amount as Belli's initial capital contribution.  E.R. 2078-80.  Accordingly, there is no issue relating to the value of Belli's partnership interest at the time of his death that could provide a basis for disturbing the Bankruptcy Court's findings or judgment.

**CONCLUSION**

For the foregoing reasons, the judgment of the Bankruptcy Court is **AFFIRMED**.

**IT IS SO ORDERED.**

Dated: April 3, 2008                          _____
                                                        MARTIN J. JENKINS
                                                        UNITED STATES DISTRICT JUDGE

---

[9] With respect to such an interest, Louisiana partnership law limits the deceased partner's successors to "an amount equal to the value that the share of the former partner had at the time membership ceased."  Louisiana Civil Code art. 2823.  "The former partner is not entitled to an interest in the assets of the partnership but is only entitled to be paid an amount equal to the value of his interest as of the time his membership ceased.  Louisiana Civil Code art. 2823 rev. cmt.  For the same reasons discussed above, this Court finds that *Robinson* does not prevent the application of Article 2823 to Belli's interest in the Group partnership.